(Slip Opinion) OCTOBER TERM, 2021 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SHURTLEFF ET AL. *v.* CITY OF BOSTON ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 20–1800.  Argued January 18, 2022—Decided May 2, 2022

Just outside the entrance to Boston City Hall, on City Hall Plaza, stand three flagpoles.  Boston flies the American flag from the first pole and the flag of the Commonwealth of Massachusetts from the second.  Boston usually flies the city's own flag from the third pole.  But Boston has, for years, allowed groups to hold ceremonies on the plaza during which participants may hoist a flag of their choosing on the third pole in place of the city's flag.  Between 2005 and 2017, Boston approved the raising of about 50 unique flags for 284 such ceremonies.  Most of these flags were other countries', but some were associated with groups or causes, such as the Pride Flag, a banner honoring emergency medical service workers, and others.  In 2017, Harold Shurtleff, the director of an organization called Camp Constitution, asked to hold an event on the plaza to celebrate the civic and social contributions of the Christian community; as part of that ceremony, he wished to raise what he described as the "Christian flag."  The commissioner of Boston's Property Management Department worried that flying a religious flag at City Hall could violate the Establishment Clause and found no past instance of the city's having raised such a flag.  He therefore told Shurtleff that the group could hold an event on the plaza but could not raise their flag during it.  Shurtleff and Camp Constitution (petitioners) sued, claiming that Boston's refusal to let them raise their flag violated, among other things, the First Amendment's Free Speech Clause.  The District Court held that flying private groups' flags from City Hall's third flagpole amounted to government speech, so Boston could refuse petitioners' request without running afoul of the First Amendment.  The First Circuit affirmed.  This Court granted certiorari to decide whether the flags Boston allows others to fly express government speech, and whether Boston could, consistent with the Free

Speech Clause, deny petitioners' flag-raising request.

*Held*: 1. Boston's flag-raising program does not express government
speech.  Pp. 5–12.

  (a) The Free Speech Clause does not prevent the government from
declining to express a view.  See *Pleasant Grove City* v. *Summum*, 555
U. S. 460, 467–469.  The government must be able to decide what to
say and what not to say when it states an opinion, speaks for the com-
munity, formulates policies, or implements programs.  The boundary
between government speech and private expression can blur when, as
here, the government invites the people to participate in a program.
In those situations, the Court conducts a holistic inquiry to determine
whether the government intends to speak for itself or, rather, to regu-
late private expression.  The Court's cases have looked to several types
of evidence to guide the analysis, including: the history of the expres-
sion at issue; the public's likely perception as to who (the government
or a private person) is speaking; and the extent to which the govern-
ment has actively shaped or controlled the expression.  See *Walker* v.
*Texas Div., Sons of Confederate Veterans, Inc.*, 576 U. S. 200, 209–213.
Considering these indicia in *Summum*, the Court held that the mes-
sages of permanent monuments in a public park constituted govern-
ment speech, even when the monuments were privately funded and
donated.  See 555 U. S., at 470–473.  In *Walker*, the Court found that
license plate designs proposed by private groups also amounted to gov-
ernment speech because, among other reasons, the State that issued
the plates "maintain[ed] direct control over the messages conveyed" by
"actively" reviewing designs and rejecting over a dozen proposals.  576
U. S., at 213.  On the other hand, in *Matal* v. *Tam*, the Court concluded
that trademarking words or symbols generated by private registrants
did not amount to government speech because the Patent and Trade-
mark Office did not exercise sufficient control over the nature and con-
tent of those marks to convey a governmental message.  582 U. S.___,
___.  Pp. 5–6.

  (b) Applying this government-speech analysis here, the Court finds
that some evidence favors Boston, and other evidence favors Shurtleff.
The history of flag flying, particularly at the seat of government, sup-
ports Boston.  Flags evolved as a way to symbolize communities and
governments.  Not just the content of a flag, but also its presence and
position have long conveyed important messages about government.
Flying a flag other than a government's own can also convey a govern-
mental message.  For example, another country's flag outside Blair
House, across the street from the White House, signals that a foreign
leader is visiting.  Consistent with this history, flags on Boston's City
Hall Plaza usually convey the city's messages.  Boston's flag symbol-

Syllabus

izes the city and, when flying at halfstaff, conveys a community message of sympathy or somber remembrance.  The question remains whether, on the 20 or so times a year when Boston allowed private groups to raise their own flags, those flags, too, expressed the city's message.  The circumstantial evidence of the public's perception does not resolve the issue.  The most salient feature of this case is that Boston neither actively controlled these flag raisings nor shaped the messages the flags sent.  To be sure, Boston maintained control over an event's date and time to avoid conflicts, and it maintained control over the plaza's physical premises, presumably to avoid chaos.  But the key issue is whether Boston shaped or controlled the flags' content and meaning; such evidence would tend to show that Boston intended to convey the flags' messages as its own.  And on that issue, Boston's record is thin.  Boston says that all (or at least most) of the 50 unique flags it approved reflect particular city-endorsed values or causes. That may well be true of flying other nations' flags, or the Pride Flag raised annually to commemorate Boston Pride Week, but the connection to other flag-raising ceremonies, such as one held by a community bank, is more difficult to discern.  Further, Boston told the public that it sought "to accommodate all applicants" who wished to hold events at Boston's "public forums," including on City Hall Plaza. App. to Pet. for Cert. 137a.  The city's application form asked only for contact information and a brief description of the event, with proposed dates and times.  The city employee who handled applications testified that he did not request to see flags before the events.  Indeed, the city's practice was to approve flag raisings without exception—that is, until petitioners' request.  At the time, Boston had no written policies or clear internal guidance about what flags groups could fly and what those flags would communicate.  Boston's control is therefore not comparable to the degree of government involvement in the selection of park monuments in *Summum*, see 555 U. S., at 472–473, or license plate designs in *Walker*, see 576 U. S., at 213.  Boston's come-one-come-all practice— except, that is, for petitioners' flag—is much closer to the Patent and Trademark Office's policy of registering all manner of trademarks in *Matal*, see 582 U. S., at ___, ___.  All told, Boston's lack of meaningful involvement in the selection of flags or the crafting of their messages leads the Court to classify the third-party flag raisings as private, not government, speech.  Pp. 6–12.

　　2.  Because the flag-raising program did not express government speech, Boston's refusal to let petitioners fly their flag violated the Free Speech Clause of the First Amendment.  When the government does not speak for itself, it may not exclude private speech based on "religious viewpoint"; doing so "constitutes impermissible viewpoint discrimination."  *Good News Club* v. *Milford Central School*, 533 U. S.

98, 112. Boston concedes that it denied petitioners' request out of Establishment Clause concerns, solely because the proposed flag "promot[ed] a specific religion." App. to Pet. for Cert. 155a. In light of the Court's government-speech holding, Boston's refusal to allow petitioners to raise their flag because of its religious viewpoint violated the Free Speech Clause. Pp. 12–13.

986 F. 3d 78, reversed and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, KAVANAUGH, and BARRETT, JJ., joined. KAVANAUGH, J., filed a concurring opinion. ALITO, J., filed an opinion concurring in the judgment, in which THOMAS and GORSUCH, JJ., joined. GORSUCH, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–1800

HAROLD SHURTLEFF, ET AL., PETITIONERS *v.* CITY OF BOSTON, MASSACHUSETTS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[May 2, 2022]

JUSTICE BREYER delivered the opinion of the Court.

When the government encourages diverse expression— say, by creating a forum for debate—the First Amendment prevents it from discriminating against speakers based on their viewpoint. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 828–830 (1995). But when the government speaks for itself, the First Amendment does not demand airtime for all views. After all, the government must be able to "promote a program" or "espouse a policy" in order to function. *Walker* v. *Texas Div.*, *Sons of Confederate Veterans*, *Inc.*, 576 U. S. 200, 208 (2015). The line between a forum for private expression and the government's own speech is important, but not always clear.

This case concerns a flagpole outside Boston City Hall. For years, Boston has allowed private groups to request use of the flagpole to raise flags of their choosing. As part of this program, Boston approved hundreds of requests to raise dozens of different flags. The city did not deny a single request to raise a flag until, in 2017, Harold Shurtleff, the director of a group called Camp Constitution, asked to fly a

Christian flag. Boston refused. At that time, Boston admits, it had no written policy limiting use of the flagpole based on the content of a flag. The parties dispute whether, on these facts, Boston reserved the pole to fly flags that communicate governmental messages, or instead opened the flagpole for citizens to express their own views. If the former, Boston is free to choose the flags it flies without the constraints of the First Amendment's Free Speech Clause. If the latter, the Free Speech Clause prevents Boston from refusing a flag based on its viewpoint.

We conclude that, on balance, Boston did not make the raising and flying of private groups' flags a form of government speech. That means, in turn, that Boston's refusal to let Shurtleff and Camp Constitution raise their flag based on its religious viewpoint "abridg[ed]" their "freedom of speech." U. S. Const., Amdt. I.

## I

### A

The flagpole at issue stands at the entrance of Boston City Hall. See Appendix, *infra*. Built in the late 1960s, Boston City Hall is a raw concrete structure, an example of the brutalist style. Critics of the day heralded it as a public building that "articulates its functions" with "strength, dignity, grace, and even glamor." J. Conti, A New City Hall: Boston's Boost for Urban Renewal, Wall Street Journal, Feb. 12, 1969, p. 14. (The design has since proved somewhat more controversial. See, *e.g.*, E. Mason, Boston City Hall Named World's Ugliest Building, Boston Herald (Nov. 15, 2008), https://www.bostonherald.com/2008/11/15/boston-city-hall-named-worlds-ugliest-building.) More to the point, Boston City Hall sits on City Hall Plaza, a 7-acre expanse paved with New England brick. Inspired by open public spaces like the Piazza del Campo in Siena, the plaza was designed to be "'Boston's fairground,'" a "public gathering spac[e]" for the people. N. DeCosta-Klipa, Why Is

Boston City Hall the Way It Is? Boston.com (July 25, 2018), https://www.boston.com/news/history/2018/07/25/boston-city-hall-brutalism.

On the plaza, near City Hall's entrance, stand three 83-foot flagpoles. Boston flies the American flag from the first pole (along with a banner honoring prisoners of war and soldiers missing in action). From the second, it flies the flag of the Commonwealth of Massachusetts. And from the third, it usually (but not always) flies Boston's flag—a sketch of the "City on a Hill" encircled by a ring against a blue backdrop.

Boston makes City Hall Plaza available to the public for events. Boston acknowledges that this means the plaza is a "public forum." Brief for Respondents 27. The city's policy is, "[w]here possible," "to accommodate all applicants seeking to take advantage of the City of Boston's public forums," including the plaza and the area at the flagpoles' base. App. to Pet. for Cert. 133a, 137a.

For years, since at least 2005, the city has allowed groups to hold flag-raising ceremonies on the plaza. Participants may hoist a flag of their choosing on the third flagpole (in place of the city's flag) and fly it for the duration of the event, typically a couple of hours. Most ceremonies have involved the flags of other countries—from Albania to Venezuela—marking the national holidays of Bostonians' many countries of origin. But several flag raisings have been associated with other kinds of groups or causes, such as Pride Week, emergency medical service workers, and a community bank. All told, between 2005 and 2017, Boston approved about 50 unique flags, raised at 284 ceremonies. Boston has no record of refusing a request before the events that gave rise to this case. We turn now to those events.

B

In July 2017, Harold Shurtleff, the director of an organization called Camp Constitution, asked to hold a flag-

raising event that September on City Hall Plaza. The event would "commemorate the civic and social contributions of the Christian community" and feature remarks by local clergy. *Id.*, at 130a–131a. As part of the ceremony, the organization wished to raise what it described as the "Christian flag." *Id.,* at 131a. To the event application, Shurtleff attached a photo of the proposed flag: a red cross on a blue field against a white background.

The commissioner of Boston's Property Management Department said no. The problem was "not the content of the Christian flag," but "the fact that it was the Christian flag or [was] called the Christian flag." App. in No. 20–1158 (CA1), at 212–213 (deposition of then-commissioner Gregory T. Rooney, hereafter Rooney deposition). The commissioner worried that flying a religious flag at City Hall could violate the Constitution's Establishment Clause and found no record of Boston ever having raised such a flag. He told Shurtleff that Camp Constitution could proceed with the event if they would raise a different flag. Needless to say, they did not want to do so.

C

Shurtleff and Camp Constitution (petitioners) sued Boston and the commissioner of its Property Management Department (respondents). Petitioners claimed that Boston's refusal to let them raise their flag violated, among other things, the First Amendment's Free Speech Clause. They asked for an immediate order requiring Boston to allow the flag raising, but the District Court denied the request. See 337 F. Supp. 3d 66 (Mass. 2018), aff'd, 928 F. 3d 166 (CA1 2019). The parties engaged in discovery. At its close, they filed cross-motions for summary judgment. The parties agreed to all relevant facts and submitted a joint statement setting them out. App. to Pet. for Cert. 128a–160a.

On that record, the District Court held that flying private

groups' flags from City Hall's third pole amounted to government speech. See 2020 WL 555248, \*5, \_\_\_ F. Supp. 3d \_\_\_, \_\_\_ (Mass., Feb. 4, 2020). Hence, the city acted within its constitutional authority in declining to raise Camp Constitution's flag. *Id.,* at \*3, \*5. The District Court therefore granted summary judgment for Boston. The First Circuit affirmed. See 986 F. 3d 78 (2021).

Shurtleff and Camp Constitution next petitioned this Court for certiorari. We agreed to decide whether the flags Boston allows groups to fly express government speech, and whether Boston could, consistent with the Free Speech Clause, deny petitioners' flag-raising request.

## II
### A

The first and basic question we must answer is whether Boston's flag-raising program constitutes government speech. If so, Boston may refuse flags based on viewpoint.

The First Amendment's Free Speech Clause does not prevent the government from declining to express a view. See *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 467–469 (2009). When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say. See *Walker*, 576 U. S., at 207–208. That must be true for government to work. Boston could not easily congratulate the Red Sox on a victory were the city powerless to decline to simultaneously transmit the views of disappointed Yankees fans. The Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks. See *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 235 (2000).

The boundary between government speech and private expression can blur when, as here, a government invites the people to participate in a program. In those situations,

when does government-public engagement transmit the government's own message? And when does it instead create a forum for the expression of private speakers' views?

In answering these questions, we conduct a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression. Our review is not mechanical; it is driven by a case's context rather than the rote application of rigid factors. Our past cases have looked to several types of evidence to guide the analysis, including: the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression. See *Walker*, 576 U. S., at 209–214.

Considering these indicia in *Summum*, we held that the messages of permanent monuments in a public park constituted government speech, even when the monuments were privately funded and donated. See 555 U. S., at 470–473. In *Walker*, we explained that license plate designs proposed by private groups also amounted to government speech because, among other reasons, the State that issued the plates "maintain[ed] direct control over the messages conveyed" by "actively" reviewing designs and rejecting over a dozen proposals. 576 U. S., at 213. In *Matal* v. *Tam*, 582 U. S. ___ (2017), on the other hand, we concluded that trademarking words or symbols generated by private registrants did not amount to government speech. *Id.*, at ___–___ (slip op., at 14–18). Though the Patent and Trademark Office had to approve each proposed mark, it did not exercise sufficient control over the nature and content of those marks to convey a governmental message in so doing. *Ibid.* These precedents point our way today.

### B

Applying the government-speech analysis to this record,

we find that some evidence favors Boston, and other evidence favors Shurtleff.

To begin, we look to the history of flag flying, particularly at the seat of government. Were we to consider only that general history, we would find that it supports Boston.

Flags are almost as old as human civilization. Indeed, flags *symbolize* civilization. From the "primordial rag dipped in the blood of a conquered enemy and lifted high on a stick," to the feudal banner bearing a lord's coats of arms, to the standards of the Aztecs, nearly every society has taken a piece of cloth and "endow[ed] it, through the circumstances of its display, with a condensed power" to speak for the community. W. Smith, Flags Through the Ages and Across the World 1–2, 32, 34 (1975). Little wonder that the Continental Congress, seeking to define a new nation, "[r]esolved" on June 14, 1777, "[t]hat the Flag of the . . . United States be thirteen stripes, alternate red and white: that the union be thirteen stars, white in a blue field, representing a new constellation." 8 Journals of the Continental Congress 1774–1789, p. 464 (W. Ford ed. 1907). Today, the American flag continues to symbolize our Nation, a constellation of 50 stars standing for the 50 States.

Other contemporary flags, both state and local, reflect their communities. Boston's flag, for instance, bears the city's seal and motto rendered in blue and buff—the colors of the Continental Army's Revolutionary War uniforms. See Symbols of the City of Boston, City of Boston (July 16, 2016), https://www.boston.gov/departments/tourism-sports-and-entertainment/symbols-city-boston (Symbols of Boston).

Not just the content of a flag, but also its presence and position have long conveyed important messages about government. The early morning sight of the stars and stripes above Fort McHenry told Francis Scott Key (and, through his poem, he told the rest of us) that the great experiment—

the land of the free—had survived the British attack on Bal-
timore Harbor. See C. Lineberry, The Story Behind the
Star Spangled Banner, Smithsonian Magazine (Mar. 1,
2007). No less familiar, a flag at halfstaff tells us that the
government is paying its "respect to th[e] memory" of some-
one who has died. 4 U. S. C. §7(m). (Congress has ex-
plained, across several sections of the U. S. Code, the mean-
ing we should take from the "position," "manner," "time,"
and "occasions" of the American flag's display. §§6, 7.) And
the presence of the Royal Standard flying from Windsor
Castle's Round Tower says the Queen is home. See Windsor
Castle Today, Royal Collection Trust, www.rct.uk/visit/
windsor-castle/windsor-castle-today.

The flying of a flag other than a government's own can
also convey a governmental message. A foreign flag outside
Blair House, across the street from the White House, sig-
nals that a foreign leader is visiting and the residence has
"becom[e] a de facto diplomatic mission of the guest's home
nation." M. French, United States Protocol: The Guide to
Official Diplomatic Etiquette 298 (2010). And, according to
international custom, when flags of two or more nations are
displayed together, they cannot be flown one nation above
the other "in time of peace." 4 U. S. C. §7(g).

Keeping with this tradition, flags on Boston's City Hall
Plaza usually convey the city's messages. On a typical day,
the American flag, the Massachusetts flag, and the City of
Boston's flag wave from three flagpoles. Boston's flag, when
flying there at full mast, symbolizes the city. When flying
at halfstaff, it conveys a community message of sympathy
or somber remembrance. When displayed at other public
buildings, it marks the mayor's presence. See Symbols of
Boston. The city also sometimes conveys a message by re-
placing its flag with another. When Boston's mayor lost a
bet with Montreal's about whose hockey team would win a
playoff series, Boston, duty-bound in defeat, hoisted the
Canadiens' banner. See Tr. of Oral Arg. 54–55.

While this history favors Boston, it is only our starting point. The question remains whether, on the 20 or so times a year when Boston allowed private groups to raise their own flags, those flags, too, expressed the city's message. So we must examine the details of *this* flag-flying program.

Next, then, we consider whether the public would tend to view the speech at issue as the government's. In this case, the circumstantial evidence does not tip the scale. On an ordinary day, a passerby on Cambridge Street sees three government flags representing the Nation, State, and city. Those flags wave "in unison, side-by-side, from matching flagpoles," just outside "'the entrance to Boston's seat of government.'" 986 F. 3d, at 88. Like the monuments in the public park in *Summum*, the flags "play an important role in defining the identity that [the] city projects to its own residents and to the outside world." 555 U. S., at 472. So, like the license plates in *Walker*, the public seems likely to see the flags as "'conveying some message'" on the government's "'behalf.'" 576 U. S., at 212 (quoting *Summum*, 555 U. S., at 471).

But as we have said, Boston allowed its flag to be lowered and other flags to be raised with some regularity. These other flags were raised in connection with ceremonies at the flagpoles' base and remained aloft during the events. Petitioners say that a pedestrian glimpsing a flag other than Boston's on the third flagpole might simply look down onto the plaza, see a group of private citizens conducting a ceremony without the city's presence, and associate the new flag with them, not Boston. Thus, even if the public would ordinarily associate a flag's message with Boston, that is not necessarily true for the flags at issue here. Again, this evidence of the public's perception does not resolve whether Boston conveyed a city message with these flags.

Finally, we look at the extent to which Boston actively controlled these flag raisings and shaped the messages the flags sent. The answer, it seems, is not at all. And that is

the most salient feature of this case.

To be sure, Boston maintained control over an event's date and time to avoid conflicts. It maintained control over the plaza's physical premises, presumably to avoid chaos. And it provided a hand crank so that groups could rig and raise their chosen flags. But it is Boston's control over the flags' content and meaning that here is key; that type of control would indicate that Boston meant to convey the flags' messages.

On this issue, Boston's record is thin. Boston says that all (or at least most) of the 50 unique flags it approved reflect particular city-approved values or views. Flying flags associated with other countries celebrated Bostonians' many different national origins; flying other flags, Boston adds, was not "wholly unconnected" from a diversity message or "some other day or cause the City or Commonwealth had already endorsed." Brief for Respondents 8, 35. That may well be true of the Pride Flag raised annually to commemorate Boston Pride Week. See Brief for Commonwealth of Massachusetts et al. as *Amici Curiae* 25–26 (citing reports that the then-mayor of Boston gave remarks as the Pride Flag was raised). But it is more difficult to discern a connection to the city as to, say, the Metro Credit Union flag raising, a ceremony by a local community bank.

In any event, we do not settle this dispute by counting noses—or, rather, counting flags. That is so for several reasons. For one thing, Boston told the public that it sought "to accommodate all applicants" who wished to hold events at Boston's "public forums," including on City Hall Plaza. App. to Pet. for Cert. 137a. The application form asked only for contact information and a brief description of the event, with proposed dates and times. The city employee who handled applications testified by deposition that he had previously "never requested to review a flag or requested changes to a flag in connection with approval"; nor did he even see flags before the events. *Id.*, at 150a. The city's

practice was to approve flag raisings, without exception. It has no record of denying a request until Shurtleff's. Boston acknowledges it "hadn't spent a lot of time really thinking about" its flag-raising practices until this case. App. in No. 20–1158 (CA1), at 140 (Rooney deposition). True to its word, the city had nothing—no written policies or clear internal guidance—about what flags groups could fly and what those flags would communicate.

Compare the extent of Boston's control over flag raisings with the degree of government involvement in our most relevant precedents. In *Summum*, we emphasized that Pleasant Grove City always selected which monuments it would place in its park (whether or not the government funded those monuments), and it typically took ownership over them. 555 U. S., at 472–473. In *Walker*, a state board "maintain[ed] direct control" over license plate designs by "actively" reviewing every proposal and rejecting at least a dozen. 576 U. S., at 213. Boston has no comparable record.

The facts of this case are much closer to *Matal* v. *Tam*. There, we held that trademarks were not government speech because the Patent and Trademark Office registered all manner of marks and normally did not consider their viewpoint, except occasionally to turn away marks it deemed "offensive." 582 U. S., at \_\_\_, \_\_\_ (slip op., at 14, 22). Boston's come-one-come-all attitude—except, that is, for Camp Constitution's religious flag—is similar.

Boston could easily have done more to make clear it wished to speak for itself by raising flags. Other cities' flag-flying policies support our conclusion. The City of San Jose, California, for example, provides in writing that its "'flagpoles are not intended to serve as a forum for free expression by the public,'" and lists approved flags that may be flown "'as an expression of the City's official sentiments.'" See Brief for Commonwealth of Massachusetts et al. as *Amici Curiae* 18.

All told, while the historical practice of flag flying at government buildings favors Boston, the city's lack of meaningful involvement in the selection of flags or the crafting of their messages leads us to classify the flag raisings as private, not government, speech—though nothing prevents Boston from changing its policies going forward.

## III

Last, we consider whether Boston's refusal to allow Shurtleff and Camp Constitution to raise their flag amounted to impermissible viewpoint discrimination.

Boston acknowledges that it denied Shurtleff's request because it believed flying a religious flag at City Hall could violate the Establishment Clause. And it admits this concern proceeded from the premise that raising the flag would express government speech. See Brief in Opposition 23 (explaining that "viewpoint neutrality" was "incompatible" with Boston's view of its program). But we have rejected that premise in the preceding pages. We must therefore consider Boston's actions in light of our holding.

When a government does not speak for itself, it may not exclude speech based on "religious viewpoint"; doing so "constitutes impermissible viewpoint discrimination." *Good News Club* v. *Milford Central School*, 533 U. S. 98, 112 (2001). Applying that rule, we have held, for example, that a public university may not bar student-activity funds from reimbursing only religious groups. See *Rosenberger*, 515 U. S., at 830–834. Here, Boston concedes that it denied Shurtleff's request solely because the Christian flag he asked to raise "promot[ed] a specific religion." App. to Pet. for Cert. 155a (quoting Rooney deposition). Under our precedents, and in view of our government-speech holding here, that refusal discriminated based on religious viewpoint and violated the Free Speech Clause.

\*    \*    \*

For the foregoing reasons, we conclude that Boston's flag-raising program does not express government speech. As a result, the city's refusal to let Shurtleff and Camp Constitution fly their flag based on its religious viewpoint violated the Free Speech Clause of the First Amendment. We reverse the First Circuit's contrary judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# APPENDIX TO OPINION OF THE COURT

The flagpoles outside Boston City Hall fly the American flag, the Commonwealth of Massachusetts flag, and the city flag, side by side, on an ordinary day.



Source: Preservation Priorities, Boston Preservation Alliance (Feb. 3, 2022), https://boston-preservation. org/news-item/preservation-priorities-letter-mayor-wu

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–1800

_____

## HAROLD SHURTLEFF, ET AL., PETITIONERS *v.* CITY OF BOSTON, MASSACHUSETTS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[May 2, 2022]

JUSTICE KAVANAUGH, concurring.

This dispute arose only because of a government official's mistaken understanding of the Establishment Clause. A Boston official believed that the City would violate the Establishment Clause if it allowed a religious flag to briefly fly outside of City Hall as part of the flag-raising program that the City had opened to the public. So Boston granted requests to fly a variety of secular flags, but denied a request to fly a religious flag. As this Court has repeatedly made clear, however, a government does not violate the Establishment Clause merely because it treats religious persons, organizations, and speech equally with secular persons, organizations, and speech in public programs, benefits, facilities, and the like. See, *e.g., Zelman* v. *Simmons-Harris*, 536 U. S. 639 (2002). On the contrary, a government *violates* the Constitution when (as here) it *excludes* religious persons, organizations, or speech because of religion from public programs, benefits, facilities, and the like. See, *e.g., Espinoza* v. *Montana Dept. of Revenue*, 591 U. S. \_\_\_ (2020); *Good News Club* v. *Milford Central School*, 533 U. S. 98 (2001); *McDaniel* v. *Paty*, 435 U. S. 618 (1978). Under the Constitution, a government may not treat religious persons, religious organizations, or religious speech as second-class.

# SUPREME COURT OF THE UNITED STATES

———————

No. 20–1800

———————

## HAROLD SHURTLEFF, ET AL., PETITIONERS *v.* CITY OF BOSTON, MASSACHUSETTS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[May 2, 2022]

JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE GORSUCH join, concurring in the judgment.

I agree with the Court's conclusion that Boston (hereafter City) violated the First Amendment's guarantee of freedom of speech when it rejected Camp Constitution's application to fly what it characterized as a "Christian flag." But I cannot go along with the Court's decision to analyze this case in terms of the triad of factors—history, the public's perception of who is speaking, and the extent to which the government has exercised control over speech—that our decision in *Walker* v. *Texas Div., Sons of Confederate Veterans, Inc.*, 576 U. S. 200 (2015), derived from *Pleasant Grove City* v. *Summum*, 555 U. S. 460 (2009). See *ante*, at 6–12. As the Court now recognizes, those cases did not set forth a test that always and everywhere applies when the government claims that its actions are immune to First Amendment challenge under the government-speech doctrine. And treating those factors as a test obscures the real question in government-speech cases: whether the government is *speaking* instead of regulating private expression.

I

The government-speech doctrine recognizes that the Free Speech Clause of the First Amendment "restricts government regulation of private speech" but "does not regulate

government speech." *Summum*, 555 U. S., at 467. That doctrine presents no serious problems when the government speaks in its own voice—for example, when an official gives a speech in a representative capacity or a governmental body issues a report. But courts must be very careful when a government claims that speech by one or more private speakers is actually government speech. When that occurs, it can be difficult to tell whether the government is using the doctrine "as a subterfuge for favoring certain private speakers over others based on viewpoint," *id.*, at 473, and the government-speech doctrine becomes "susceptible to dangerous misuse," *Matal* v. *Tam*, 582 U. S. ___, ___–___ (2017) (slip op., at 13–14).

In *Tam*, for example, the United States defended a statutory provision that permitted the Patent and Trademark Office to deny federal registration to "disparag[ing]" marks, 15 U. S. C. §1052(a), on the theory that "the registration of a trademark converts the mark into government speech." 582 U. S., at ___ (slip op., at 17). We rejected that argument and held that because the Government's role in registration was limited to applying a standard of assessment to marks generated by private parties, registered marks are not government speech. *Id.,* at ___–___ (slip op., at 12–14). But the Government's position had radical implications: If registration transforms trademarks into government speech, the same logic would presumably hold for other speech included on systems of government registration. Books on the copyright registry, for example, would count as the Government's own speech—presumably subject to editorial control. And the Government would be free to exclude authors from copyright protection based on their views. *Id.,* at ___–___ (slip op., at 17–18).

To prevent the government-speech doctrine from being used as a cover for censorship, courts must focus on the identity of the speaker. The ultimate question is whether the government is actually expressing its own views or the

real speaker is a private party and the government is sur-
reptitiously engaged in the "regulation of private speech."
*Summum*, 555 U. S., at 467. But our precedent has never
attempted to specify a general method for deciding that
question, and the Court goes wrong in proceeding as though
our decisions in *Walker* and *Summum* settled on anything
that might be considered a "government-speech analysis."
*Ante*, at 6. In both cases, we employed a fact-bound totality-
of-the-circumstances inquiry that relied on the factors that
appeared helpful in evaluating whether the speech at issue
was government or private speech. See *Walker*, 576 U. S.,
at 210–213; *Summum*, 555 U. S., at 470–478. We did not
set out a test to be used in all government-speech cases, and
we did not purport to define an exhaustive list of relevant
factors. And in light of the ultimate focus of the govern-
ment-speech inquiry, each of the factors mentioned in those
cases could be relevant only insofar as it sheds light on the
identity of the speaker. When considered in isolation from
that inquiry, the factors central to *Walker* and *Summum*
can lead a court astray.

Consider first "the extent to which the government has
actively shaped or controlled the expression." *Ante*, at 6.
Government control over speech is relevant to speaker iden-
tity in that speech by a private individual or group cannot
constitute government speech if the government does not
attempt to control the message. But control is also an es-
sential element of censorship. Consider this example. The
British Licensing Act of 1737, 10 Geo. II c. 28, §1, in 17 Eng.
Stat. at Large 140 (1765), as amended by the Theatres Act
of 1843, 6 & 7 Vict. c. 68, §2 (1843), prohibited the perfor-
mance of any "interlude, tragedy, comedy, opera, play,
farce, or other entertainment" without a patent issued by
the King of England or a "License from the Lord Chamber-
lain of Her Majesty's Household." *Ibid*. This regime at-
tracted criticism precisely because it gave the Lord Cham-
berlain extensive "control over the nature and content,"

*ante,* at 6, of covered performances. One of the leading critics of the Act—the playwright George Bernard Shaw—was denied permission to perform several plays, including Mrs. Warren's Profession, The Shewing-up of Blanco Posnet, and Press Cuttings.[1] But had the Lord Chamberlain approved these plays, would anyone seriously maintain that those plays were thereby transmuted into the government's speech?

As this illustration shows, neither "control" nor "final approval authority" can in itself distinguish government speech from censorship of private speech, and analyzing that factor in isolation from speaker identity flattens the distinction between government speech and speech tolerated by the censor. And it is not as though "actively" exercising control over the "nature and content" of private expression makes a difference, as the Court suggests, *ibid.* Censorship is not made constitutional by aggressive and direct application.

Next, turn to the history of the means of expression. *Ibid.* Historical practice can establish that a means of expression "*typically* represent[s] government speech." *Summum*, 555 U. S., at 470 (emphasis added); *Tam*, 582 U. S., at ___ (slip op., at 17). But in determining whether speech is the government's, the real question is not whether a form of expression is *usually* linked with the government but whether the speech *at issue* expresses the government's own message. Governments can put public resources to novel uses. And when governments allow private parties to use a resource normally devoted to government speech to express their own messages, the government cannot rely on historical expectations to pass off private speech as its own. Cf. *Summum*, 555 U. S., at 480 (explaining that even though monuments in parks are normally government speech, that

--------

[1] See generally L. Hugo, Edwardian Shaw: The Writer and His Age 197–230 (1999).

would not be true if "a town created a monument on which all of its residents (or all those meeting some other criterion) could place the name of a person to be honored or some other private message").

This case exemplifies the point. Governments have long used flags to express government messages, so this factor provides prima facie support for Boston's position under the Court's mode of analysis. *Ante*, at 7–9. But on these facts, the history of flags clearly cannot have any bearing on whether the flag displays express the City's own message. The City put the flagpoles to an unorthodox use—allowing private parties to use the poles to express messages that were not formulated by City officials. Treating this factor as significant in that circumstance loads the dice in favor of the government's position for no obvious reason.

Now consider the third factor: "the public's likely perception as to who (the government or a private person) is speaking." *Ante*, at 6. Our earlier government-speech precedents recognized that "the correct focus" of the government-speech inquiry "is not on whether the . . . reasonable viewer would identify the speech as the government's," *Johanns* v. *Livestock Marketing Assn.*, 544 U. S. 550, 564, n. 7 (2005), and with good reason. Unless the public is assumed to be omniscient, public perception cannot be relevant to whether the government *is* speaking, as opposed merely *appearing* to speak. Focusing on public perception encourages courts to categorize private expression as government speech in circumstances in which the public is liable to misattribute that speech to the government. This case once again provides an apt illustration. As the Court rightly notes, "[a] passerby on Cambridge Street" confronted with a flag flanked by government flags standing just outside the entrance of Boston's seat of government would likely conclude that all of those flags "conve[y] some message on the government's behalf." *Ante*, at 9 (internal quotation marks

omitted).  If that is the case, this factor supports the exclusion of private parties from using the flagpoles even though the government allows private parties to use the flagpoles to express private messages, presumably because those messages may be erroneously attributed to the government. But there is no obvious reason why a government should be entitled to suppress private views that might be attributed to it by engaging in viewpoint discrimination.  The government can always disavow any messages that might be mistakenly attributed to it.

The factors relied upon by the Court are thus an uncertain guide to speaker identity.  But beyond that, treating these factors as a freestanding test for the existence of government speech artificially separates the question whether the government is speaking from whether the government is facilitating or regulating private speech.  Under the Court's factorized approach, government speech occurs when the government exercises a "sufficient" degree of control over speech that occurs in a setting connected with government speech in the eyes of history and the contemporary public, regardless of whether the government is actually merely facilitating private speech.  This approach allows governments to exploit public expectations to mask censorship.

And like any factorized analysis, this approach cannot provide a principled way of deciding cases.  The Court's analysis here proves the point.  The Court concludes that two of the three factors—history and public perception—favor the City.  But it nonetheless holds that the flag displays did not constitute government speech.  Why these factors drop out of the analysis—or even do not justify a contrary conclusion—is left unsaid.  This cannot be the right way to determine when governmental action is exempt from the First Amendment.

## II

## A

I would resolve this case using a different method for determining whether the government is speaking. In my view, the minimum conditions that must be met for expression to count as "government speech" can be identified by considering the definition of "government speech" and the rationale for the government-speech doctrine. Under the resulting view, government speech occurs if—but only if—a government purposefully expresses a message of its own through persons authorized to speak on its behalf, and in doing so, does not rely on a means that abridges private speech.

Defined in literal terms, "government speech" is "speech" spoken by the government. "Speech," as that term is used in our First Amendment jurisprudence, refers to expressive activity that is "intended to be communicative" and, "in context, would reasonably be understood . . . to be communicative." *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 294 (1984); see also *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S 557, 569 (1995). Our government-speech precedents have worked with largely the same definition. See, *e.g.*, *Summum*, 555 U. S., at 472 (accepting monument for placement in a city park "constitute[d] government speech" because the monuments were "meant to convey and have the effect of conveying a government message"); *Walker*, 576 U. S., at 214 (similar). And although this definition of "speech" is not fully precise, the purposeful communication of the speaker's own message generally qualifies as "speech."

For "speech" to be spoken by the government, the relevant act of communication must be government action. Governments are not natural persons and can only communicate through human agents who have been given the power to speak for the government. When individuals charged with speaking on behalf of the government act

within the scope of their power to do so, they "are not speaking as citizens for First Amendment purposes." *Garcetti* v. *Ceballos*, 547 U. S. 410, 421 (2006). And because "speech" requires the purposeful communication of the speaker's own message, the message expressed must have been formulated by a person with the power to determine what messages the government will communicate. In short, the government must "se[t] the overall message to be communicated" through official action. *Johanns*, 544 U. S., at 562.

Government speech is thus the purposeful communication of a governmentally determined message by a person exercising a power to speak for a government. But not all governmental activity that qualifies as "government speech" in this literal and factual sense is exempt from First Amendment scrutiny. For although we have said that the Free Speech Clause "has no application" when a government is "engaging in [its] own expressive conduct," *Summum*, 555 U. S., at 467, we have also recognized that "the Free Speech Clause itself may constrain the government's speech" under certain conditions, as when a "government seeks to compel private persons to convey the government's speech." *Walker*, 576 U. S., at 208; see also *Wooley* v. *Maynard*, 430 U. S. 705 (1977); *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943).

That is because the government-speech doctrine is not based on the view—which we have neither accepted nor rejected—that governmental entities have First Amendment rights. See *United States* v. *American Library Assn.*, *Inc.*, 539 U. S. 194, 210–211 (2003); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94, 139, and n. 7 (1973) (Stewart, J., concurring).[2] Instead, the

---

[2] The text of the First Amendment also seems to exclude the possibility that the Federal Government has a constitutional right to speak, since it prohibits "Congress" and other federal entities and actors from "abridging the freedom of speech." A different analysis might be called for in a

doctrine is based on the notion that governmental communication—and the exercise of control over those charged by law with implementing a government's communicative agenda—do not normally "restrict the activities of . . . persons acting as private individuals." *Rust* v. *Sullivan*, 500 U. S. 173, 198–199 (1991); see also *Summum*, 555 U. S., at 467 ("The Free Speech Clause restricts government regulation of private speech"); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 833–835 (1995). So government speech in the literal sense is not exempt from First Amendment attack if it uses a means that restricts private expression in a way that "abridges" the freedom of speech, as is the case with compelled speech. Were it otherwise, virtually every government action that regulates private speech would, paradoxically, qualify as government speech unregulated by the First Amendment. Naked censorship of a speaker based on viewpoint, for example, might well constitute "expression" in the thin sense that it conveys the government's disapproval of the speaker's message. But plainly that kind of action cannot fall beyond the reach of the First Amendment.

It follows that to establish that expression constitutes government speech exempt from First Amendment attack, the government must satisfy two conditions. First, it must show that the challenged activity constitutes government speech in the literal sense—purposeful communication of a governmentally determined message by a person acting within the scope of a power to speak for the government. Second, the government must establish it did not rely on a

———————

case in which the Federal Government attempts to restrict the speech of another sovereign. If the States had First Amendment rights against the Federal Government at the time of ratification, it is not obvious why that right would be eliminated by the incorporation of the speech rights of *private* citizens against the States through the Fourteenth Amendment.

means that abridges the speech of persons acting in a private capacity.  It is only then that "the Free Speech Clause has no application." *Summum*, 555 U. S., at 467.

This framework explains the conditions under which government communication that relies on private parties can constitute government speech.  Our precedents recognize two ways in which a government can speak using private assistance.  First, the government can prospectively "enlis[t] private entities to convey its own message," *Rosenberger*, 515 U. S., at 833, by deputizing private persons as its agents.  See *Johanns*, 544 U. S., at 560–562, and n. 4; *Rust*, 500 U. S., at 192–200.  In that kind of situation, private persons assume a public or quasi-public capacity that empowers them to speak on behalf of the government.  So long as this responsibility is voluntarily assumed, speech by a private party within the scope of his power to speak for the government constitutes government speech.

Second, the government can "adop[t]" a medium of expression created by a private party and use it to express a government message.  *Summum*, 555 U. S., at 473–474.  In that circumstance, private parties are not deputized by the government; instead a private person generates a medium of expression and transfers it to the government.  *Id.*, at 472–474.  For the adopted expression to qualify as the government's, the private party must alienate control over the medium of expression to the government.  And government actors must put the medium to use to intentionally express a government message.  Compare *id.*, at 473–475 (holding that a government adopted donated monument because it "took ownership of that monument and put it on permanent display in a park that it owns and manages"), with *Tam*, 582 U. S., at \_\_\_, \_\_\_–\_\_\_ (slip op., at 5, 12–15) (no adoption occurred because governments neither produced nor took ownership of privately generated trademarks).  Otherwise, the government is simply providing a forum for private parties to submit their own productions and usual First

Amendment principles apply. And to avoid running afoul of the prohibition on compelled speech, that alienation must be voluntary.[3]

This approach also explains the circumstances in which we have concluded that the government is *not* speaking. We have repeatedly held that the government-speech doctrine does not extend to private-party speech that is merely subsidized or otherwise facilitated by the government. See, *e.g.*, *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533, 542 (2001); *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 229 (2000); *Rosenberger*, 515 U. S., at 833–834. Facilitating speech by private persons cannot constitute government speech unless the government assigns a power to speak to those persons or appropriates the products of their expressive activity to express its own message. When the government's role is limited to applying a standard of assessment to determine a speaker's eligibility for a benefit, the government is regulating private speech, and ordinary First Amendment principles apply. *Tam*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at 13–14).

For analogous reasons, private-party expression in any type of forum recognized by our precedents does not constitute government speech. A forum, by definition, is a space

––––––––––

[3] The place of *Walker* within this framework warrants comment. In that case, properly understood, the government claimed to have adopted specialty-license-plate designs submitted by private parties and actually did "ow[n] the designs on its license plates," *Walker* v. *Texas Div., Sons of Confederate Veterans, Inc.*, 576 U. S. 200, 212 (2015). But it was not obvious how designs such as "Rather Be Golfing" could possibly express a government message. *Id.,* at 222 (ALITO, J., dissenting). In other words, although the private parties alienated control over the plate designs, the government did not have any purpose to communicate, and instead allowed private parties to use personal plates to communicate their own messages. This expansive understanding of government speech by adoption should be confined to government-issued IDs. As we have said, *Walker* "likely marks the outer bounds of the government-speech doctrine." *Matal* v. *Tam*, 582 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 17).

for private parties to express their own views.  The govern-
ment can of course speak as a participant in a forum, but
the creation of a space for private discourse does not involve
expressing a governmental message, deputizing private
parties to express it, or adopting a private party's contribu-
tion as a vehicle of government speech.  So when examina-
tion of the government's "policy and practice" indicates that
the government has "intentionally open[ed] a nontradi-
tional forum for public discourse," a court may immediately
infer that private-party expression in the forum is not gov-
ernment speech. *Cornelius* v. *NAACP Legal Defense & Ed.
Fund, Inc.*, 473 U. S. 788, 802 (1985).  There is no need to
consider history, public perception, or control in the ab-
stract.

B

Analyzed under this framework, the flag displays were
plainly private speech within a forum created by the City,
not government speech.  The record attests that the City's
application materials—which were the only written form of
guidance available on the program prior to the adoption of
a written policy in 2018—characterized the flagpoles as one
of the City's "public forums." App. to Pet. for Cert. 137a.
The application guidelines did not enumerate any criteria
for access to the flagpoles that go beyond those typical of a
resource that has been made generally available to the pub-
lic.  *Id.*, at 137a–140a. The first rejection of an application
was the denial of Camp Constitution's application in 2017.
*Id.,* at 150a–158a.  Prior to then, the City never rejected any
request to raise a flag submitted by any private party.  And
private speakers accounted for 78% of the flag-raising ap-
plicants.  See Reply Brief 8.

A program with this design cannot possibly constitute
government speech.  The City did nothing to indicate an in-
tent to communicate a message.  *Clark*, 468 U. S., at 294.
Nor did it deputize private speakers or appropriate private-

party expressive content. The flags flown reflected a dizzying and contradictory array of perspectives that cannot be understood to express the message of a single speaker. For example, the City allowed parties to fly the gay pride flag, App. to Pet. for Cert. 142a, but it allowed others to fly the flag of Ethiopia, *id.*, at 174a, a country in which "homosexual act[s]" are punishable by "imprisonment for not less than one year." The Crim. Code of Fed. Democratic Republic of Eth. 2004, Arts. 629 and 630, Proclamation No. 414/2004. Indeed, the City disclaimed virtually all messages expressed by characterizing the flagpoles as a "public forum" and adopting access criteria consistent with generalized public use. The City's policy and practice thus squarely indicate an intent to open a public forum for any private speakers who met the City's basic criteria. The requirement of viewpoint neutrality applies to any forum of this kind. *Cornelius*, 473 U. S., at 802.

As the Court rightly holds, denying Shurtleff 's application to use that forum constituted impermissible viewpoint discrimination. *Ante*, at 12–13. The City's stated reason for rejecting Camp Constitution's application was an unwritten "policy and practice" of "'refrain[ing] from flying non-secular flags on the City Hall flagpoles.'" App. to Pet. for Cert. 153a–154a. But as we have recognized, religion constitutes a viewpoint, and "speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious point of view." *Good News Club* v. *Milford Central School*, 533 U. S. 98, 112 (2001); *Rosenberger*, 515 U. S., at 835.

The City's decision was grounded in a belief that "[e]stablished First Amendment jurisprudence" prohibits a government from allowing a private party to "fly a [r]eligious flag on public property." App. to Pet. for Cert. 153a–154a. But "[m]ore than once," this Court has "rejected the position

that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design." *Rosenberger*, 515 U. S., at 839; see also *Good News Club*, 533 U. S., at 112; *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993). Indeed, excluding religious messages from public forums that are open to other viewpoints is a "denial of the right of free speech" indicating "hostility to religion" that would "undermine the very neutrality the Establishment Clause requires." *Rosenberger*, 515 U. S., at 845–846; see also *Board of Ed. of Westside Community Schools* (*Dist. 66*) v. *Mergens*, 496 U. S. 226, 248 (1990) (plurality opinion).

Although developments in City policy postdating the denial of Shurtleff's application are not relevant to whether that act constituted a First Amendment violation, it should be emphasized that the City's adoption of a written policy in October 2018 did not to convert the flag displays into government speech. The policy's principal provision specified that the City will not "display flags deemed to be inappropriate or offensive in nature or those supporting discrimination, prejudice, or religious" viewpoints. App. in No. 20–1158 (CA1), p. 570 (App).[4] That provision did not identify a

———————

[4] The policy included six other rules specifying that: (1) flag raisings must occur on "a normal business work day, generally between the hours of 10:00 am and 3:00 pm"; (2) flag raisings must be open to the public and "[g]uests must adhere to the City of Boston policy not to discriminate on the basis of sex, race, religion, etc."; (3) guests must deliver the "guest flag" to City personnel before the raising and retrieve it after; (4) events must be consistent with the City's "sustainability" policy; (5) flags may be lowered to comply with the U. S. Flag Code; and (6) flags will normally be flown for 24 hours or fewer. App. 570. These criteria do not suggest purposeful communication of a government message. The policy also reserved "sole and complete discretion" to refuse to fly any flag. *Id.,* at 569. But this reservation unbridled discretionary control over access to a government-owned medium of expression cannot establish that a speaker permitted to speak through the medium is speaking for the government.

message the City intended to express; it simply codified the
City's prior exclusion of speakers expressing a "religious
viewpoint" and extended it to messages deemed "offensive,"
despite the "bedrock First Amendment principle" that
"[s]peech may not be banned on the ground that it expresses
ideas that offend." *Tam*, 582 U. S., at \_\_\_–\_\_\_ (slip op., at
1–2).

In briefing before this Court, counsel for the City argued
that despite all appearances to the contrary, the City actu-
ally *did* intend to express a message through the flag-rais-
ing program: The City's support for "the diverse national
heritage of the City's population." Brief for Respondents 19.
All other flag raisings, the City claims, occurred "in connec-
tion with some publicly designated date of observance."
*Ibid.* This argument is a transparent attempt to reverse
engineer a governmental message from facts about the flag
raisings that occurred. It is true that many of the flag rais-
ings from 2007 to 2015 celebrated nationalities. App. to
Pet. for Cert. 173a–187a. But these events were conducted
by private organizations to express their own support for
the relevant national communities. Neither the City's ap-
plication guidance nor the 2018 written policy singled out a
connection with a nationality commemoration as a condi-
tion of access to the flagpoles. The City never cited this
purported requirement in its rejection of the applications it
denied. And the City approved flags that had nothing to do
with nationality or official holidays, such as the "Metro
Credit Union Flag Raising" mentioned by the Court.

Even if the City *had* reserved the flagpoles for nationality
commemorations and official holidays, that would only
mean that the City had reserved the flagpoles "for certain
groups or for the discussion of certain topics" and created a
nonpublic forum, not that it had engaged in government

--------

Instead, such discretionary authority is a hallmark of a standardless sys-
tem of censorship.

speech. *Rosenberger*, 515 U. S., at 829; see also *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 49 (1983) ("Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity").  Had the City restricted use of the flagpoles to these subject matters, it could have relied on the forum's topical limitations to deny applications to host events.  But it could not have employed viewpoint-discriminatory criteria to bar otherwise-eligible speakers from expressing their own views on those subjects.

On this record, however, the only viable inference is that the City had no policy restricting access to the forum apart from the modest access conditions articulated in the application materials.  Having created a forum with those characteristics, the City could not reject Shurtleff's application on account of the religious viewpoint he intended to express.  For that reason, I agree with the Court's ultimate conclusion and concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–1800

_____

## HAROLD SHURTLEFF, ET AL., PETITIONERS *v.* CITY OF BOSTON, MASSACHUSETTS, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[May 2, 2022]

JUSTICE GORSUCH, with whom JUSTICE THOMAS joins, concurring in the judgment.

The real problem in this case doesn't stem from Boston's mistake about the scope of the government speech doctrine or its error in applying our public forum precedents. The trouble here runs deeper than that. Boston candidly admits that it refused to fly the petitioners' flag while allowing a secular group to fly a strikingly similar banner. And the city admits it did so for one reason and one reason only: It thought displaying the petitioners' flag would violate "'the [C]onstitution's [E]stablishment [C]lause.'" App. to Pet. for Cert. 157a; see also *id.*, at 153a–154a. That decision led directly to this lawsuit, all the years of litigation that followed, and the city's loss today. Not a single Member of the Court seeks to defend Boston's view that a municipal policy allowing all groups to fly their flags, secular and religious alike, would offend the Establishment Clause.

How did the city get it so wrong? To be fair, at least some of the blame belongs here and traces back to *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971). Issued during a "'bygone era'" when this Court took a more freewheeling approach to interpreting legal texts, *Food Marketing Institute* v. *Argus Leader Media*, 588 U. S. \_\_\_, \_\_\_ (2019) (slip op., at 8), *Lemon* sought to devise a one-size-fits-all test for resolving Establishment Clause disputes. That project bypassed any

inquiry into the Clause's original meaning. It ignored longstanding precedents. And instead of bringing clarity to the area, *Lemon* produced only chaos. In time, this Court came to recognize these problems, abandoned *Lemon*, and returned to a more humble jurisprudence centered on the Constitution's original meaning. Yet in this case, the city chose to follow *Lemon* anyway. It proved a costly decision, and Boston's travails supply a cautionary tale for other localities and lower courts.

\*

To see how all this unfolded, start with *Lemon* itself. *Lemon* held out the promise that any Establishment Clause dispute could be resolved by following a neat checklist focused on three questions: (1) Did the government have a secular purpose in its challenged action? (2) Does the effect of that action advance or inhibit religion? (3) Will the government action "excessive[ly] . . . entangl[e]" church and state? 403 U. S., at 612–613 (internal quotation marks omitted). But from the start, this seemingly simple test produced more questions than answers. How much religion-promoting purpose is too much? Are laws that serve both religious and secular purposes problematic? How much of a religion-advancing effect is tolerable? What does "excessive entanglement" even mean, and what (if anything) does it add to the analysis? Putting it all together, too, what is a court to do when *Lemon*'s three inquiries point in conflicting directions? More than 50 years later, the answers to all these questions remain unknown.

The only sure thing *Lemon* yielded was new business for lawyers and judges. Before *Lemon*, this Court had never held a flag or other similar public display to constitute an unconstitutional "establishment" of religion. See Congressional Research Service, C. Brougher, Public Display of the Ten Commandments and Other Religious Symbols 1–2 (2011) (Brougher); M. McConnell, No More (Old) Symbol

Cases, 2019 Cato Sup. Ct. Rev. 91 (2019) (Symbol Cases). After *Lemon*, cases challenging public displays under the Establishment Clause came fast and furious. And just like the test itself, the results proved a garble. May a State or local government display a Christmas nativity scene? Some courts said yes, others no.[1] How about a menorah? Again, the answers ran both ways.[2] What about a city seal that features a cross? Good luck.[3]

If anything, the confusion grew with time. In the years following *Lemon*, this Court modified its "effects" test by requiring lower courts to ask whether a "reasonable observer" would consider the government's challenged action to be an "endorsement" of religion. See, *e.g.*, *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 593 (1989); *id.*, at 630 (O'Connor, J., concurring in part and concurring in judgment). But rather than fix *Lemon*'s problems, this new gloss compounded them. Some argued that any reasonable observer worthy of the name would consider all the relevant facts and law, just as a judge or jury must. See *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 778–781 (1995) (O'Connor, J., concurring in part). Others suggested that a reasonable observer could make mistakes about the law or fail to consider all the facts. See, *e.g.*, *American Atheists, Inc.* v. *Duncan*, 616 F. 3d 1145, 1160–1161 (CA10 2010). And that suggestion only raised even more questions. Just

—————

[1] Compare *Lynch* v. *Donnelly*, 465 U. S. 668, 671–672 (1984) (yes), and *American Civil Liberties Union of Ky.* v. *Wilkinson*, 895 F. 2d 1098, 1099–1100, 1104 (CA6 1990) (yes), with *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 578–579 (1989) (no), and *Smith* v. *County of Albemarle*, 895 F. 2d 953, 955, 958–960 (CA4 1990) (no).

[2] Compare *Allegheny*, 492 U. S., at 578–581 (yes), and *Skoros* v. *New York*, 437 F. 3d 1, 3–4 (CA2 2006) (yes), with *Kaplan* v. *Burlington*, 891 F. 2d 1024, 1025–1026, 1030–1031 (CA2 1989) (no).

[3] Compare *Murray* v. *Austin*, 947 F. 2d 147, 149 (CA5 1991) (yes), with *Harris* v. *Zion*, 927 F. 2d 1401, 1402 (CA7 1991) (no).

how mistake-prone might an observer be and still qualify as reasonable?  On what authority may courts exercise the awesome power of judicial review to declare a duly enacted law unconstitutional thanks only to (admitted) errors about the relevant facts or law?  See *American Atheists*, *Inc.* v. *Davenport*, 637 F. 3d 1095, 1108–1110 (CA10 2010) (Gorsuch, J., dissenting from denial of rehearing en banc).

Ultimately, *Lemon* devolved into a kind of children's game.  Start with a Christmas scene, a menorah, or a flag.  Then pick your own "reasonable observer" avatar.  In this game, the avatar's default settings are lazy, uninformed about history, and not particularly inclined to legal research.  His default mood is irritable.  To play, expose your avatar to the display and ask for his reaction.  How does he *feel* about it?  Mind you:  Don't ask him whether the proposed display actually amounts to an establishment of religion.  Just ask him if he *feels* it "endorses" religion.  If so, game over.

Faced with such a malleable test, risk-averse local officials found themselves in an ironic bind.  To avoid Establishment Clause liability, they sometimes felt they had to discriminate against religious speech and suppress religious exercises.  But those actions, in turn, only invited liability under other provisions of the First Amendment.  The hard truth is, *Lemon*'s abstract and ahistoric test put "[p]olicymakers . . . in a vise between the Establishment Clause on one side and the Free Speech and Free Exercise Clauses on the other."  *Pinette*, 515 U. S., at 767–768 (plurality opinion).

Our case illustrates the problem.  The flags of many nations bear religious symbols.  So do the flags of various private groups.  Historically, Boston has allowed them all.  The city has even flown a flag with a cross nearly identical in size to the one on petitioners' flag.  It was a banner presented by a secular group to commemorate the Battle of Bunker Hill.  See Appendix, *infra* (photographs).  Yet when

the petitioners offered their flag, the city flinched. Perhaps it worried: Would the assigned judge's imagined "reasonable observer" bother to learn about its generous policy for secular groups? Would this observer take the trouble to consult the long tradition in this country allowing comparable displays? Or would he turn out to be an uninformed passerby offended by the seeming incongruity of a new flag flying beside those of the city, State, and Nation? Who could tell. Better to err on the safe side and reject the petitioners' flag. As it turned out, though, that route only invited years of litigation and a unanimous adverse decision because no government may discriminate against religious speech in a public forum. To avoid a spurious First Amendment problem, Boston wound up inviting a real one. Call it a *Lemon* trade.[4]

*

While it is easy to see how *Lemon* led to a strange world in which local governments have sometimes violated the First Amendment in the name of protecting it, less clear is why this state of affairs still persists. *Lemon* has long since

———————

[4] It seems possible, too, that these spurious Establishment Clause concerns embolden government officials to treat religion with hostility even when they don't rely on *Lemon* by name. Sometimes colleges seek to prevent students from engaging in religious speech, labeling expressions of faith "fighting words." See *Uzuegbunam* v. *Preczewski*, 592 U. S. \_\_\_, \_\_\_–\_\_\_ (2021) (slip op., at 1–3). Certain public transit systems that sell advertising space on trains and buses ban religious messages. See *Archdiocese of Washington* v. *Washington Metropolitan Area Transit Authority*, 589 U. S. \_\_\_, \_\_\_–\_\_\_ (2020) (GORSUCH, J., respecting denial of certiorari) (slip op., at 1–2); *Northeastern Pa. Freethought Soc.* v. *County of Lackawanna Transit Sys.*, 938 F. 3d 424, 428–431 (CA3 2019). And some governments seek to exclude religious groups from using public facilities or designations available to others. See *InterVarsity Christian Fellowship/USA* v. *University of Iowa*, 5 F. 4th 855, 860–862 (CA8 2021); *Bronx Household of Faith* v. *Board of Ed.*, 750 F. 3d 184, 192 (CA2 2014). All of these trades resulted in less First Amendment protection and more needless litigation.

been exposed as an anomaly and a mistake.

From the birth of modern Establishment Clause litiga-
tion in *Everson* v. *Board of Ed. of Ewing*, this Court looked
primarily to historical practices and analogues to guide its
analysis. 330 U. S. 1, 9–15 (1947). So, for example, while
the dissent in *Everson* disagreed with some of the majority's
conclusions about what qualifies as an establishment of re-
ligion, it readily agreed that "[n]o provision of the Constitu-
tion is more closely tied to or given content by its generating
history than the religious clause of the First Amendment."
*Id.*, at 33–49 (Rutledge, J., dissenting). This approach fit,
too, with this Court's usual course in other areas. Often, we
have looked to early and long-continued historical practices
as evidence of the Constitution's meaning at the time of its
adoption.[5] And, in the years following *Everson*, the Court
followed this same path when interpreting the Establish-
ment Clause. Agree or disagree with the conclusions in
these cases, there can be little doubt that the Court ap-
proached them in large part using history as its guide.[6]

––––––––––

[5] See, *e.g.*, *McDonald* v. *Chicago*, 561 U. S. 742, 767–770 (2010); *Giles*
v. *California*, 554 U. S. 353, 358 (2008); see also *The Pocket Veto Case*,
279 U. S. 655, 689 (1929).

[6] See, *e.g.*, *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 680
(1970) (upholding tax exemptions for churches because they were sup-
ported by "more than a century of our history and uninterrupted prac-
tice"); *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 294
(1963) (Brennan, J., concurring) ("[T]he line we must draw between the
permissible and the impermissible is one which accords with history and
faithfully reflects the understanding of the Founding Fathers");
*McGowan* v. *Maryland*, 366 U. S. 420, 437–440 (1961) (assessing "the
place of Sunday Closing Laws in the First Amendment's history"); *Tor-
caso* v. *Watkins*, 367 U. S. 488, 490 (1961) (concluding that religious-test
oaths were one of the elements of "the formal or practical" religious es-
tablishments that "many of the early colonists left Europe and came here
hoping to" avoid). JUSTICE THOMAS has raised important questions about
this Court's incorporation of the Establishment Clause against the
States in these cases. But "[e]ven assuming" incorporation, the Clause
"would only protect against an 'establishment' of religion as understood
at the founding." *Espinoza* v. *Montana Dept. of Revenue*, 591 U. S. ___,

*Lemon* interrupted this long line of precedents.  It offered no plausible reason for ignoring their teachings.  And, as we have seen, the ahistoric alternative it offered quickly proved both unworkable in practice and unsound in its results.  Nor is it as if *Lemon* vanquished the field even during its heyday.  Often, this Court continued to look to history to resolve certain Establishment Clause disputes outside the context of religious displays.[7]  And several early decisions applying *Lemon* were themselves rapidly overruled in part or in whole.[8]  All of which in time led Justice after Justice to conclude that *Lemon* was "flawed in its fundamentals," "unworkable in practice," and "inconsistent with our history and our precedents."  *County of Allegheny*, 492 U. S., at 655, 669 (Kennedy, J., concurring in judgment in part and dissenting in part).[9]

———————

\_\_\_ (2020) (THOMAS, J., concurring) (slip op., at 2).

[7] See, *e.g.*, *Marsh* v. *Chambers*, 463 U. S. 783, 786 (1983) (surveying history to determine that "[f]rom colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom").

[8] See, *e.g.*, *Agostini* v. *Felton*, 521 U. S. 203, 236 (1997) (overruling *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373 (1985), and *Aguilar* v. *Felton*, 473 U. S. 402 (1985)); *Mitchell* v. *Helms*, 530 U. S. 793, 835 (2000) (plurality opinion) (overruling *Wolman* v. *Walter*, 433 U. S. 229 (1977), and *Meek* v. *Pittenger*, 421 U. S. 349 (1975)).

[9] See also, *e.g.*, *Salazar* v. *Buono*, 559 U. S. 700, 720–721 (2010) (plurality opinion of Kennedy, J., joined in full by ROBERTS, C. J., and in part by ALITO, J.); *Van Orden* v. *Perry*, 545 U. S. 677, 699–700 (2005) (BREYER, J., concurring) (noting "*Lemon*'s checkered career in the decisional law of this Court" (internal quotation marks omitted)); *id.*, at 692–693 (THOMAS, J., concurring) ("This case would be easy if the Court were willing to abandon the inconsistent guideposts it has adopted for addressing Establishment Clause challenges"); *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U. S. 844, 890 (2005) (Scalia, J., joined in full by Rehnquist, C. J., and THOMAS, J., and in part by Kennedy, J., dissenting) ("[A] majority of the Justices on the current Court . . . have, in separate opinions, repudiated the brain-spun '*Lemon* test'"); *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet*, 512 U. S. 687, 720 (1994)

Recognizing *Lemon*'s flaws, this Court has not applied its test for nearly two decades.  In *Town of Greece* v. *Galloway*, this Court declined an invitation to use the *Lemon* test.  See 572 U. S. 565, 577 (2014); Brief for Respondents in *Town of Greece* v. *Galloway*, O. T. 2013, No. 12–696, pp. 58–60.  Instead, the Court explained that the primary question in Establishment Clause cases is whether the government's conduct "accords with history and faithfully reflects the understanding of the Founding Fathers."  572 U. S., at 577 (internal quotation marks omitted).  The Court observed that this form of analysis represents the rule rather than "an exception" within the "Court's Establishment Clause jurisprudence."  *Id.*, at 575–577 (internal quotation marks omitted).

In *American Legion* v. *American Humanist Association* we underscored the message.  588 U. S. ___, ___ (2019) (plurality opinion) (slip op., at 25).  Again we expressly refused to apply *Lemon*, this time in a challenge to a public display—the very kind of dispute *Lemon*'s test ushered into existence and where it once held sway.  588 U. S., at ___–___ (slip op., at 13–16).  Again we explained that "[i]f the *Lemon* Court thought that its test would provide a framework for all future Establishment Clause decisions, its expectation has not been met."[10]  *Id.*, at ___ (slip op., at 13).

––––––––––

(O'Connor, J., concurring in part and concurring in judgment); *Committee for Public Ed. and Religious Liberty* v. *Regan*, 444 U. S. 646, 671 (1980) (Stevens, J., dissenting) (disparaging "the sisyphean task of trying to patch together the 'blurred, indistinct, and variable barrier' described in *Lemon*").

[10] See also *American Legion*, 588 U. S., at ___ (THOMAS, J., concurring in judgment) (slip op., at 7) ("[B]ecause the *Lemon* test is not good law, we ought to say so"); *id.*, at ___ (GORSUCH, J., concurring in judgment) (slip op., at 7) ("*Lemon* was a misadventure.  It sought a 'grand unified theory' of the Establishment Clause but left us only a mess"); *id.*, at ___ (KAVANAUGH, J., concurring) (slip op., at 1) ("As this case again demonstrates, this Court no longer applies the old test articulated in *Lemon*").

And again we stressed that the right place to look for guidance lies in "'"'historical practices and understandings."'" *Id.*, at \_\_\_ (slip op., at 25) (quoting *Town of Greece*, 572 U. S., at 576).

\*

With all these messages directing and redirecting the inquiry to original meaning as illuminated by history, why did Boston still follow *Lemon* in this case? Why do other localities and lower courts sometimes do the same thing, allowing *Lemon* even now to "si[t] up in its grave and shuffl[e] abroad"? *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 398 (1993) (Scalia, J., concurring in judgment). There may be other contributing factors, but let me address two.

First, it's hard not to wonder whether some simply prefer the policy outcomes *Lemon* can be manipulated to produce. Just dial down your hypothetical observer's concern with facts and history, dial up his inclination to offense, and the test is guaranteed to spit out results more hostile to religion than anything a careful inquiry into the original understanding of the Constitution could sustain. *Lemon* may promote an unserious, results-oriented approach to constitutional interpretation. But for some, that may be more a virtue than a vice.

There is more than a little in the record before us to suggest this line of thinking. As city officials tell it, Boston did not want to "'display flags deemed to be inappropriate or offensive in nature or those supporting discrimination, prejudice, or religious movements.'" App. to Pet. for Cert. 160a. Instead, the city wanted to celebrate only "a particular kind of diversity." Tr. of Oral Arg. 85–86. And if your policy goal is to lump in religious speech with fighting words and obscenity, if it is to celebrate only a "particular" type of diversity consistent with popular ideology, the First Amendment is not exactly your friend. Dragging *Lemon* from its grave

may be your only chance.

To the extent this is why some still invoke *Lemon* today, it reflects poorly on us all. Through history, the suppression of unpopular religious speech and exercise has been among the favorite tools of petty tyrants. See *Pinette*, 515 U. S., at 760; *Feldman* v. *United States*, 322 U. S. 487, 501 (1944) (Black, J., dissenting). Our forebears resolved that this Nation would be different. Here, they resolved, each individual would enjoy the right to make sense of his relationship with the divine, speak freely about man's place in creation, and have his religious practices treated with respect. See *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943). The day governments in this country forage for ways to abandon these foundational promises is a dark day for the cause of individual freedom.

Besides, even for those whose policy ambitions run in this direction, invoking *Lemon* is a myopic tactic. For as long as the First Amendment means anything, government policies that discriminate against religious speech and exercise will only invite litigation and result in losses like Boston's. Today's case is just one more in a long line of reminders about the costs associated with governmental efforts to discriminate against disfavored religious speakers. See *Good News Club* v. *Milford Central School*, 533 U. S. 98, 120 (2001); *Lamb's Chapel*, 508 U. S., at 392–397; *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 823–824, 845–846 (1995).

Second, it seems that *Lemon* may occasionally shuffle from its grave for another and more prosaic reason. By demanding a careful examination of the Constitution's original meaning, a proper application of the Establishment Clause no doubt requires serious work and can pose its challenges. *Lemon*'s abstract three-part test may seem a simpler and tempting alternative to busy local officials and lower courts. But if this is part of the problem, it isn't without at least a partial remedy. For our constitutional history

contains some helpful hallmarks that localities and lower courts can rely on.

Beyond a formal declaration that a religious denomination was in fact the established church, it seems that founding-era religious establishments often bore certain other telling traits. See M. McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2110–2112, 2131 (2003) (Establishment and Disestablishment). First, the government exerted control over the doctrine and personnel of the established church. Second, the government mandated attendance in the established church and punished people for failing to participate. Third, the government punished dissenting churches and individuals for their religious exercise. Fourth, the government restricted political participation by dissenters. Fifth, the government provided financial support for the established church, often in a way that preferred the established denomination over other churches. And sixth, the government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function. See *id.*, at 2131–2181. Most of these hallmarks reflect forms of "coerc[ion]" regarding "religion or its exercise." *Lee* v. *Weisman*, 505 U. S. 577, 587 (1992); *id.*, at 640 (Scalia, J., dissenting); *Van Orden*, 545 U. S., at 693 (THOMAS, J., concurring).

These traditional hallmarks help explain many of this Court's Establishment Clause cases, too. This Court, for example, has held unlawful practices that restrict political participation by dissenters, including rules requiring public officials to proclaim a belief in God. See *Torcaso* v. *Watkins*, 367 U. S. 488, 490 (1961). It has checked government efforts to give churches monopolistic control over civil functions. See *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116, 127 (1982). At the same time, it has upheld nondiscriminatory public financial support for religious institutions alongside

other entities. See *Espinoza* v. *Montana Dept. of Revenue*, 591 U. S. \_\_\_, \_\_\_–\_\_\_ (2020) (slip op., at 18–22); *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. \_\_\_, \_\_\_–\_\_\_ (2017) (slip op., at 14–15); *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 662–663 (2002). The thread running through these cases derives directly from the historical hallmarks of an establishment of religion—government control over religion offends the Constitution, but treating a church on par with secular entities and other churches does not. See Establishment and Disestablishment 2205–2208.

These historical hallmarks also help explain the result in today's case and provide helpful guidance for those faced with future disputes like it. As a close look at these hallmarks and our history reveals, "[n]o one at the time of the founding is recorded as arguing that the use of religious symbols in public contexts was a form of religious establishment." Symbol Cases 107. For most of its existence, this country had an "unbroken history of official acknowledgment by all three branches of government of the role of religion in American life." *Lynch*, 465 U. S., at 674.[11] In fact and as we have seen, it appears that, until *Lemon*, this Court had never held the display of a religious symbol to

———————

[11] So, for example, when designing a seal for the new Nation in 1776, Benjamin Franklin and Thomas Jefferson proposed a familiar Biblical scene—Moses leading the Israelites across the Red Sea. J. Hutson, Religion and the Founding of the American Republic 50–51 (1998) (Hutson). The seal ultimately adopted by Congress in 1782 features "the Eye of Providence" surrounded by "glory" above the motto Annuit Coeptis—"He [God] has favored our undertakings." Dept. of State, Bureau of Pub. Affairs, The Great Seal of the United States 4–6 (July 2003). This Court has recognized that President Washington's 1789 Thanksgiving Day Proclamation referred to "a day of public thanksgiving and prayer" and the role of a "Supreme Being" in "the foundations and successes of our young Nation." *Van Orden*, 545 U. S., at 686–687. And President Jefferson allowed various religious groups to use the Capitol for weekly worship services. Hutson 84–94.

constitute an establishment of religion. See Brougher 1–2; Symbol Cases 91. The simple truth is that no historically sensitive understanding of the Establishment Clause can be reconciled with a rule requiring governments to "roa[m] the land, tearing down monuments with religious symbolism and scrubbing away any reference to the divine." *American Legion*, 588 U. S., at \_\_\_ (slip op., at 20). Our Constitution was not designed to erase religion from American life; it was designed to ensure "respect and tolerance." *Id.*, at \_\_\_ (slip op., at 31).

\*

To justify a policy that discriminated against religion, Boston sought to drag *Lemon* once more from its grave. It was a strategy as risky as it was unsound. *Lemon* ignored the original meaning of the Establishment Clause, it disregarded mountains of precedent, and it substituted a serious constitutional inquiry with a guessing game. This Court long ago interred *Lemon*, and it is past time for local officials and lower courts to let it lie.

The Bunker Hill Flag

The Camp Constitution Flag





Source: App. to Pet. for Cert. 132a

Source: App. to Pet. for Cert. 146a